Filed 7/7/23  In re L.A. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.A. et al., Persons Coming Under the Juvenile Court Law. | B321643 (Los Angeles County Super. Ct. No. 21CCJP05414B-E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.A.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Stephen C. Marpet, Judge Pro Tempore.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, J.A. (father) challenges the juvenile court's jurisdictional findings and removal orders related to his four minor children. Father argues the court's findings and orders were not supported by substantial evidence.

Initially, we address the justiciability of father's appeal, including a motion filed by respondent Los Angeles County Department of Children and Family Services (Department) to dismiss the appeal. While father's appeal was pending, the juvenile court terminated its jurisdiction and issued a final custody order granting sole physical custody of father's children to their mother, father's wife, M.O. (mother), and joint legal custody of the children to mother and father. We conclude the juvenile court's postappeal orders did not render father's appeal moot because the challenged findings and orders continue to impact father's rights. In any event, even if father's appeal had been rendered moot, we would exercise our inherent discretion to reach the merits of his appeal. Thus, the Department's motion to dismiss the appeal is denied.

As discussed below, we conclude substantial evidence supports the jurisdictional findings against father as well as the juvenile court's removal orders. Thus, we affirm.

# BACKGROUND

## 1. The Family

Mother and father have four children together, two daughters and two sons (collectively, mother and father's children). When the underlying proceedings began, their children were nine years old (older daughter), seven years old (older son), three years old (younger daughter), and one year old (younger son). Father does not have any other children. Mother has an older daughter from a previous relationship (half sister). Half sister was 14 years old when these proceedings began. Half sister's biological father is not involved in her life and his whereabouts were unknown during the underlying proceedings.

At the start of the underlying proceedings, mother and father lived in a four-bedroom home with their four children, half sister, a maternal aunt, and a maternal uncle and his child. Mother and father had dated for 11 years and married a few months before the underlying proceedings began.

## 2. Petition and Detention

In September 2021, half sister reported that, the year before, in July 2020, when she was 12 years old, father had touched her in a sexual way that made her feel uncomfortable (July 2020 incident). Half sister explained father was about to go to the hospital to be with mother, who was there to give birth to their younger son. Father asked half sister if she wanted to sleep in his and mother's bed. Half sister said yes because she could watch television from that bed. She was wearing a T-shirt and shorts. Half sister was on the bed with the younger daughter, who fell asleep in the middle of the bed. Half sister was on one side of the bed next to the younger daughter, father was on the other side of his younger daughter. Half sister went to the

bathroom to brush her teeth. When she returned, the younger daughter was asleep on the side of bed where half sister had been. Thus, half sister laid down in the middle of the bed, next to father.

While they were watching television, father moved closer to half sister and put his arm around her shoulder. He told her he was sorry for treating her "bad sometimes" and "wanted to treat her better." Father asked half sister "if she wanted to cuddle." Although unsure, half sister said, "Ok," and father cuddled her while she was wrapped in a blanket. Father asked if she would share the blanket, but she said no. Father patted her on the head, which half sister said " 'weirded [her] out' " and made her feel " 'uncomfortable.' " Father put his leg over her leg and "pressed his lips against her ear." He then "put his hand on her stomach and brushed his hand against her vagina." Half sister told father to stop, she did not want to cuddle, and she moved away from him. However, father moved closer to her, again cuddled her, and put his leg on top of her leg. Half sister started to cry and, in order to get away from father, said she had to go to the bathroom, where she cried some more. When half sister came out of the bathroom, father told her he was sorry and "he was used to her mom being in the bed with him." Half sister left the room and went to sleep in her own room.

Half sister said father never touched her under her clothes. However, half sister stated that, on a separate occasion, father came into the bedroom where she slept with her half siblings. Half sister was trying to sleep when father tried to hug her. She asked father to leave and he did. Half sister also said father "rubs up against her" when she is cooking or washing dishes in the kitchen.

4

Half sister's report resulted in a referral to the Department, led to the removal of mother and father's children from father, and ultimately the filing on behalf of all the children of a three-count Welfare and Institutions Code section 300 petition (petition).[1]  The three counts of the petition were identical and brought under subdivisions (b), (d), and (j) of section 300.  The counts alleged father had "sexually abused" half sister in July 2020 by "fondl[ing] the child's vaginal area and stomach over the child's clothing, put[ting] his leg on top of the child's legs and press[ing] [his] lips against the child's ear."  The counts alleged father's conduct put all the children at risk of physical harm, including sexual abuse.  Mother was non-offending.

At the detention hearing held in early December 2021, the juvenile court detained mother and father's children from father and released them to mother under Department supervision. The court granted father monitored visitation with his four children but ordered father to have no contact with half sister. The court ordered the Department to arrange for a forensic interview of half sister.

3.   **Continued Investigation**

Prior to adjudication, the Department continued its investigation.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

### a.    Half Sister

In January 2022, a Department social worker spoke separately with half sister, who reiterated what she previously had reported.  Half sister also told the social worker father might have been trying to kiss her when he pressed his lips against her ear during the July 2020 incident.  She also thought it might have been accidental when father brushed his hand against her vagina.  She said, " '[M]aybe it was an accident, I don't think he did it on purpose, like in a sexual way.' "  Half sister explained she had not mentioned father brushing his hand over her vaginal area to mother because she did not feel comfortable talking about it and thought father might have done it accidentally.  Half sister said she had a "good relationship" with father until the July 2020 incident.  She did not want to visit or talk with father until she received therapy.  Half sister indicated she was "not accustomed to male figures in her life despite having [father] around for a majority of her life."

In early February 2022, half sister submitted to a forensic interview.  During her interview, half sister explained she "hadn't been feeling too good about the [July 2020] incident" and she "just wanted to talk to someone" but she was scared she "was gonna get in trouble because [she] had said yes to cuddling."  Eventually, half sister told a friend what happened.  That friend did not know what to say, so half sister "kept it in for a while" longer.  When she "went back to school,"[2] half sister told a couple more friends, one of whom insisted what father did was not normal and encouraged half sister to talk to an adult about the July 2020 incident.

---

[2] The timing of when half sister was "back to school" is not clear, but it appears to have been the fall of 2021.

Half sister disclosed the incident to her school counselor. Half sister told the counselor her "biggest concern" was she did not want her family being "broken up." She also discussed other incidents with the counselor involving father brushing against her in the kitchen when she was washing dishes. Half sister said, "I think he brushed past me like with his hip" a couple times "when the space was crowded."

That night, after half sister spoke with her school counselor, police officers called mother and father. Half sister explained she had not told mother about the July 2020 incident because she was scared. She "didn't want to be the reason our family was broken." She was frustrated and upset that the police became involved. Half sister had hoped she could talk to her family about what happened, "say what we think had gone wrong," and "go to some type of therapy." Eventually, half sister filed a police report.

During her forensic interview, half sister repeatedly stated she did not like father's touching and cuddling and it made her feel uncomfortable. She noted she tried to move away from father but he "kept getting like closer to me." She explained she was lying on her back while father was lying on his side, facing her, "hugging" her with "one of his legs on top of" her, "petting [her] head," tickling her stomach, and "telling [her] like a bunch of stuff about how he wanted to be affectionate with me but he was afraid my family would take it the wrong way." Half sister stated, "I think his hand slipped [when he was tickling her stomach] because it touched the front of my shorts." She was scared and retreated to the bathroom, where she cried for "a little bit." Half sister indicated she was not sure if father touched the front of her shorts on purpose or by accident.

During the interview, half sister also said mother told her father "doesn't really mean it and he's sorry . . . .  She said that he is gonna go to a class . . . for like parenting."  Half sister told mother she did not believe father had bad intentions when he was touching her.

Half sister told the interviewer father had apologized for making her feel uncomfortable.  Father told half sister he "thought it was normal to cuddle with me because he cuddles with my mom and my like siblings.  And it's like he's showing them affection, so he didn't mean it in a bad way."  Father told her he was not trying to be inappropriate and apologized if it came across that way.  He told half sister he would "move somewhere else" but she did not want that.  She said, "I want my siblings to still have a dad and I want my dad back too . . . so I [am] just waiting for this to get cleared up."  She stated, "I feel like this is just like a bad misunderstanding . . . and I just want this to get cleared up because honestly I want things to go back to the way they were."  She wanted to go to family therapy so they could learn to communicate better.

By May 2022, the Department noted mother was having trouble enrolling half sister in therapy sessions.  Half sister's school reported she had begun "to display poor attendance and poor academic performance recently which appears to be of concern[ ] especially since the child is not receiving therapy sessions."

In the Department's assessment, although half sister generally provided a consistent account of events over time, her "verbiage has shifted where she is now attempting to justify [father's] actions by dismissing them as a 'mistake and accidental touch' which are words utilized by the mother during her

explanation of events." The Department believed half sister was minimizing what happened and noted she continued to feel uncomfortable about having a relationship with father at that time.

### b. Father

Initially, in early October 2021, father denied doing anything inappropriate to or with half sister. He said "he would not want someone to do that to his own child so he would not touch [half sister] or any of his kids." In reference to the July 2020 incident, father stated he only had watched television in bed with half sister and his younger daughter.

In January 2022, however, mother reported she had confronted father about his alleged misconduct. Father told mother repeatedly " 'it was a mistake' " and " 'he didn't know what he was thinking.' " He thought he could hug or cuddle half sister in the same way he hugged and cuddled his own daughters. Father denied touching half sister's vaginal area over her clothes.

Despite multiple attempts to speak with father in January 2022, a Department social worker was unable to contact him. A due diligence search to locate father was unsuccessful. Nonetheless, it was reported father continued to support his family financially while he was out of the home.

By April 2022, father was participating in parenting classes and had been visiting with his children in person every other weekend as well as on-line. The children "love[d] seeing their father." Half sister was not participating in those visits.

### c. Mother

Mother had been unaware of the July 2020 incident until law enforcement became involved. Upon learning of half sister's allegations, mother moved half sister into her maternal aunt's

9

bedroom, which had a lock on the door and made half sister feel safe.  Mother revealed her stepfather sexually abused her as a child.  Mother said she believed half sister.  Mother and father agreed father would move out of the house so that mother and father's children and half sister could remain in the home with mother.

In January 2022, mother told the social worker half sister had not mentioned father had brushed his hand over her clothed vaginal area.  Half sister told mother father had cuddled her from behind, with his hand on her lower abdomen region, making half sister feel uncomfortable.  Mother believed half sister felt uncomfortable because father had not been affectionate with her before.  Father told mother he made a mistake and he thought he could cuddle half sister like he did his own daughters, although he denied touching half sister's vaginal area.  Mother stated she felt "like she is experiencing a brain fog," was unsure what exactly happened between father and half sister, and was confused about her relationship with father.

### d.    Mother and Father's Children

The older daughter and older son each consistently reported feeling safe in the home with mother, father, and their siblings.  They denied anyone touching their private parts, and father did not make them feel uncomfortable.  They both wanted father to return home.  The younger daughter and younger son were too young to make statements, but neither showed signs of abuse.

The Department consistently reported mother and father's children appeared happy and well cared for and had a healthy bond with their parents.

## 4.    Adjudication and Disposition

After multiple continuances, a combined adjudication and disposition hearing was held on May 13, 2022.  At the hearing, counsel for all of the children suggested amended language for the subdivision (b) count and argued the court should sustain that count as amended and dismiss the remaining counts brought under subdivisions (d) and (j).  Counsel noted, while half sister "may have changed how she characterized the [July 2020] incident with [father], she maintains consistency with what happened, with how he made her feel uncomfortable.  She had to move away from him and he continued to come close to her and touch her.  She was so uncomfortable that she had to get out of bed, go into the bathroom and she did start crying.  And this incident did weigh on her to the point that she spoke with her friends about it and her friends encouraged her to go to her school counselor."  Counsel for all of the children and the Department agreed mother and father's children should remain in the petition and be subject to the juvenile court's jurisdiction.  Both counsel believed mother and father's children were at risk based on father's actions toward half sister.

On the other hand, counsel for father argued the juvenile court should dismiss the petition in its entirety or, in the alternative, strike mother and father's children from the petition, claiming they were differently situated.  Counsel stated there was "no evidence that [father] sexually abused [half sister], let alone fondled her vagina."  Father's counsel relied on half sister's forensic interview, when she repeatedly stated father may have touched her vaginal area by accident.  Counsel noted the July 2020 incident was a "one-time incident" that did not support jurisdiction, the children were not at risk of serious physical

11

harm, and none of the children had suffered serious physical harm. Counsel stated half sister's "discomfort is simply not jurisdictional."

After hearing argument, the juvenile court sustained the subdivision (b) count as amended and dismissed the remaining two counts. The amended and sustained subdivision (b) count replaced the phrase "sexually abused" with "inappropriately touched [half sister] in the mother's absence," and removed reference to father touching half sister's stomach and vaginal area. Specifically, the sustained count read, "[Father] inappropriately touched [half sister] in the mother's absence. On 7/16/2020, [father] cuddled the [half sister], put his leg on top of the child's legs, and pressed his lips against the child's ear, making the child feel uncomfortable and upset. The inappropriate nature of [father's] conduct towards [half sister] endangers the child's physical health and safety and places [half sister] and the child's siblings [mother and father's children] at risk of serious physical harm."

The court declared mother and father's children and half sister dependents of the court under subdivision (b) of section 300. The court found half sister's earlier statements (as opposed to those made during her forensic interview) to be "the most important and the best evidence . . . of what happened." The court stated "minimizing just is an automatic happening. It just happens. They forget things. This child not only had this one incident, . . . she reported one time she was lying in bed and [father] came in her room. He told her he had to close the . . . closet door in her room. He proceeded to hug her and she told him to leave her alone."

As to the court's dispositional orders, counsel for father strenuously argued mother and father's children should not be removed from father's care. Counsel stated, mother and father's children were "very differently situated. This is not a case where [father] engaged in any aberrant sexual behavior in the children's home against their sibling. There is no evidence here that [mother and father's children] were aware of [half sister's] discomfort around their father. There is no evidence that the father has abused or neglected his own children. And there's certainly no evidence that . . . the father has any proclivity to any inappropriate sexual behavior, frankly, to any of these children." Counsel argued half sister's "discomfort with [father] is not a basis, at this point, to keep him out of his own home." Counsel for mother also asked the juvenile court to allow father to move back into the family home.

On the other hand, counsel for the Department argued father should not be allowed back into the family home. Counsel noted it had been six months since the detention hearing and half sister had been participating in counseling at school, yet half sister still wanted only monitored visits with father.

The juvenile court removed mother and father's children from father and placed them in mother's care under Department supervision. The court ordered father to participate in a parenting program, sexual abuse awareness counseling, and individual counseling. Father was granted unmonitored visits with his four children in a public setting and monitored visits with half sister in a public setting. The court granted the Department discretion to liberalize father's visits. The court ordered half sister to participate in individual counseling and, if

13

recommended by her therapist, conjoint counseling with mother and father.

**5.    Appeal**

Father appealed the juvenile court's May 13, 2022 jurisdictional findings and dispositional orders.

**6.    Postappeal Termination of Dependency Jurisdiction and Final Custody Order**

In December 2022, while this appeal was pending, the juvenile court terminated jurisdiction and entered a final custody order, granting sole physical custody of mother and father's children to mother and joint legal custody to mother and father. The court allowed father "reasonable unmonitored contact with the children."  Before father's visits could be liberalized, the court's custody order required father to complete a "sex abuse for perpetrators program" and individual counseling.  Mother was granted sole physical and legal custody of half sister.

## DISCUSSION

**1.    Justiciability and Motion to Dismiss**

As an initial matter, we address the justiciability of father's appeal.  As noted above, while father's appeal was pending, the juvenile court terminated jurisdiction and issued a final custody order granting sole physical custody of mother and father's children to mother and joint legal custody to mother and father. Father did not appeal those orders.  Based on these postappeal events, the Department moved to dismiss father's appeal as moot. The Department argues, even if we agree with father's arguments on appeal, we can afford no effective relief.  In addition, the Department claims we should not exercise our inherent discretion to consider the merits of father's appeal.

14

Father opposes the motion to dismiss and urges us to address the merits of his appeal.

Recently, in *In re D.P.* (2023) 14 Cal.5th 266, our Supreme Court addressed the justiciability of dependency appeals such as father's here. The court explained: "A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.] A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*Id.* at p. 276.)

Particularly relevant here, our Supreme Court noted, when a jurisdictional finding affects subsequent orders and "continues to impact a parent's rights—for instance, by restricting visitation or custody—that jurisdictional finding remains subject to challenge, even if the juvenile court has terminated its jurisdiction. [Citations.] Because reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief." (*In re D.P.*, *supra*, 14 Cal.5th at pp. 276–277; see also *id.* at pp. 277–278.)

Here, in terminating its jurisdiction, the juvenile court issued a final custody order limiting father's custody of his four children and requiring father to complete various programs before visitation with his children could be liberalized. Thus,

15

even though the juvenile court terminated its jurisdiction, its jurisdictional findings and removal orders continue to impact father's rights. If we were to reverse either or both of those findings and orders, our decision would call into question the juvenile court's subsequent orders. Thus, we conclude father's appeal is not moot.

Even if father's appeal was moot, however, we would exercise our inherent discretion to reach the merits of his appeal. (*In re D.P.*, *supra*, 14 Cal.5th at p. 282.) The jurisdictional findings and subsequent removal order were based on "stigmatizing conduct" (i.e., engaging in inappropriate sexualized conduct with a minor stepchild) and " 'could be prejudicial to [father] or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [father], beyond jurisdiction." ' " (*Id.* at pp. 285–286.)

Thus, the Department's motion to dismiss the appeal is denied.

**2.     Jurisdiction**

**a.     Applicable Law**

In this case, the juvenile court exercised its jurisdiction under subdivision (b) of section 300. Under that subdivision, a juvenile court may assert dependency jurisdiction over a child when, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "The

16

legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.*, *supra*, at p. 773.) "'The purpose of dependency proceedings is to prevent risk, not ignore it.'" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

### b. Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings [and disposition order] of the trial court."'" (*Ibid.*) In determining whether substantial evidence exists such that a reasonable trier of fact could find the order challenged on appeal is appropriate, we review the entire record in the light most favorable to the challenged order. (*Ibid.*)

17

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) Substantial evidence " 'is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

### c. Substantial evidence supports the juvenile court's jurisdictional findings.

Father argues substantial evidence does not support the juvenile court's jurisdictional findings against him. He states he did not sexually abuse or physically harm half sister, the July 2020 incident with half sister was an isolated event that involved accidental touching, and his and mother's four children were never harmed or at substantial risk of serious harm. In contrast, the Department argues substantial evidence supports the jurisdictional findings against father. We agree with the Department.

Both parties discuss our Supreme Court's decision in *In re I.J.*, *supra*, 56 Cal.4th 766 (*I.J.*). In that case, the court addressed the question whether a father's sexual abuse of his minor daughter supported the exercise of dependency jurisdiction over the father's minor sons. (*Id.* at p. 772.) The court held it did, concluding the father's repeated sexual abuse (including rape) of his minor daughter in the family home constituted substantial evidence supporting dependency jurisdiction over all of the father's children, regardless of gender and regardless of whether their father had abused all of them. (*Id.* at pp. 771, 778.) Our Supreme Court explained: "[T]he more severe the type of sibling abuse, the lower the required probability of the child's

18

experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*Id.* at p. 778.) *I.J.* is not entirely on point here because it focusses on the exercise of dependency jurisdiction under subdivision (j) of section 300, which subdivision is not at issue here. Nonetheless, we conclude *I.J.* offers guidance and support for dependency jurisdiction in this case.

Although, as father points out, his behavior toward half sister was not as egregious or shocking as that involved in *I.J.*, father's misconduct with half sister was serious and aberrant. While over time, half sister wavered as to whether father touched her vaginal area accidentally or on purpose, she otherwise consistently described the July 2020 incident. She repeated that, when she told father to stop and tried to move away from him, he persisted and moved closer to her. He put his leg over her, making it difficult for her to move away. He pressed his lips to her ear, as if to kiss her. All of this happened while father's younger daughter was asleep in the same bed and mother was away from the home. Indeed, father's behavior during the July 2020 incident was serious and aberrant enough that it upset daughter for over one year. Although she feared she would get in trouble, half sister eventually confided in friends and a counselor about the July 2020 incident. Once the underlying proceedings began, half sister indicated she did not want to visit with or talk to father until she had received therapy. Moreover, and contrary to father's position on appeal, the July 2020 incident was not the

19

only reported incident of father's inappropriate or suspect behavior.  Half sister also had reported that, on more than one occasion, father rubbed his hips against her in the kitchen and, once, he came into her room at night when she was in bed and tried to hug her.  Finally, father made inconsistent statements about the July 2020 incident and was difficult to locate during the proceedings below.  At first, father denied he had done anything wrong.  Later, however, he told mother he had made a mistake and did not know what he was thinking when he "cuddled" with half sister in bed.

While not as egregious as the facts in *I.J.*, this case is similar to *In re P.A.* (2006) 144 Cal.App.4th 1339, a decision our Supreme Court discussed (and did not disturb) in *I.J.*, *supra*, 56 Cal.4th at pages 775–776.  In *In re P.A.*, Division Three of this District affirmed dependency jurisdiction under section 300, subdivisions (b) and (d), over the appellant father's nine-year-old daughter and two younger sons based on the father's conduct of touching his daughter's vagina under her shorts but on top of her underwear.[3]  (*In re P.A.*, *supra*, 144 Cal.App.4th at pp. 1343, 1345–1347.)  There was no evidence the father had abused or touched his sons inappropriately.  (*Id.* at p. 1345.)  Nonetheless, the court explained, "aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior," and held substantial evidence supported dependency jurisdiction over the sons.  (*Id.* at p. 1347.)

---

[3] The juvenile court also exercised dependency jurisdiction under section 300, subdivision (b) based on the father's admitted domestic violence with the children's mother.  (*In re P.A.*, *supra*, 144 Cal.App.4th at p. 1343.)

Similarly, here, father's aberrant sexual behavior toward half sister placed father and mother's children at risk of aberrant sexual behavior. Although father was not half sister's biological father, he was a father figure in the home, where he lived with half sister, his and mother's children, and other maternal relatives. Father's behavior toward half sister in the family home was a "betrayal of the appropriate relationship between the generations" and an abandonment and violation of the parental role. (*I.J.*, *supra*, 56 Cal.4th at p. 778.)

Based on the record before us, we conclude substantial evidence supports the juvenile court's jurisdictional findings.

**3.    Removal**

**a.    Applicable Law and Standard of Review**

When a child has been adjudged a dependent child within the meaning of section 300, the juvenile court "may limit the control to be exercised over the dependent child by any parent" if necessary to protect the child. (§ 361, subd. (a)(1).) Section 361, subdivision (c)(1) permits the juvenile court to order a child removed from his or her parent if the court finds by clear and convincing evidence that the child is, or would be, at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. The juvenile court's jurisdictional findings are evidence that the child cannot safely remain in the home. (*In re A.F.* (2016) 3 Cal.App.5th 283, 292.) " ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." ' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*).) In making its determination,

21

the juvenile court may consider the parent's past conduct as well as present circumstances. (*In re A.S.*, at p. 247.)

We review the juvenile court's removal order under the substantial evidence standard of review. (*In re A.F.*, *supra*, 3 Cal.App.5th at p. 292; *I.J.*, *supra*, 56 Cal.4th at p. 773; *O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012 [appellate court reviews removal order for substantial evidence, bearing in mind the heightened burden of proof by clear and convincing evidence]; see *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].)

### b. Substantial evidence supports the juvenile court's removal order.

Father argues the juvenile court erred when it removed his and mother's children from his custody. Father claims, even assuming substantial evidence supported the court's jurisdictional findings, there was no evidence the children faced any danger in his custody and there were reasonable alternatives to removal. We disagree.

The facts supporting jurisdiction, discussed above, also support the juvenile court's removal order. Father's aberrant behavior toward half sister coupled with his inconsistent statements about that behavior support a finding that the conduct could continue and all the children were at risk. Moreover, even assuming mother and father's children should not have been removed from father, it is not clear how father could have safely returned to the family home, where half sister also lived. Finally, although the record contains some conflicting evidence, our role is not to reweigh the evidence or exercise our independent judgment. (*I.J.*, *supra*, 56 Cal.4th at p. 773.) Given the juvenile court's focus on averting harm to the children, we

22

conclude substantial evidence supports the court's removal orders here.

## DISPOSITION

The Department's motion to dismiss the appeal is denied. The juvenile court's May 13, 2022 jurisdictional findings and dispositional orders as to father are affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.